## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KENNETH ENGLAND,

    Plaintiff,

        v.

UNITED AIRLINES, INC.,

    Defendant.

Case No. 20-cv-02877

Judge Martha M. Pacold

### MEMORANDUM OPINION AND ORDER

On March 25, 2020, in response to covid and the resulting emergency economic conditions, Congress enacted the CARES Act. The Act directed the United States Department of the Treasury to provide payroll support funds of up to $25 billion in the aggregate to passenger airlines for the exclusive use of paying employee wages, salaries, and benefits. The Act required that, to be eligible for funds, an airline provide certain assurances to Treasury, including that the airline would refrain from conducting involuntary furloughs or reducing pay rates and benefits until September 30, 2020.

On April 20, 2020, United Airlines entered into an agreement with Treasury reflecting the assurances required by the Act—including that United would refrain from furloughing employees or reducing their pay rates and benefits through September 30, 2020. United received initial payroll support of approximately $2.5 billion and ultimately received payroll support of approximately $5 billion in total.

According to the complaint, despite receiving payroll support, on May 4, 2020, United mandated unpaid leave, requiring domestic management and administrative employees to take 20 unpaid days off between May 16, 2020 and September 30, 2020. After United announced the mandatory unpaid leave, plaintiff Kenneth England, a United employee, brought this putative class action against United, alleging breach of contract. England alleges that by mandating unpaid leave, United breached its agreement with Treasury. England seeks to proceed on the breach of contract claim as a third-party beneficiary of the agreement between United and Treasury.

United moved to dismiss, contending that the third-party beneficiary breach of contract claim is foreclosed by *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011). [13]. The motion to dismiss is granted. The complaint is dismissed without prejudice and with leave to amend.

## BACKGROUND

The following facts are taken from the complaint. On a motion to dismiss, the court assumes that all well-pleaded facts alleged in the complaint are true and construes them in the light most favorable to plaintiff. *Graczyk v. West Publ'g Co.*, 660 F.3d 275, 279 (7th Cir. 2011). The court may also consider documents attached to the complaint, documents that are critical to the complaint and referred to in it, information that is subject to proper judicial notice, and additional facts set forth in plaintiff's opposition to the motion to dismiss, to the extent those facts are consistent with the pleadings. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013).

## I.    Payroll Support under the CARES Act

On March 25, 2020, Congress enacted the Coronavirus Aid, Relief, and Economics Security Act (CARES Act), Pub. L. No. 116-136, 134 Stat. 281 (2020), in response to the covid pandemic and the resulting emergency economic conditions.

The CARES Act provided payroll support funds for airlines to pay their employees and directed Treasury to administer the provision of the payroll support. As relevant, Section 4112 of the CARES Act, entitled "Pandemic Relief for Aviation Workers," directed the Secretary of the Treasury to provide air carriers financial assistance to pay the air carriers' employees: "Notwithstanding any other provision of law, to preserve aviation jobs and compensate air carrier industry workers, the Secretary shall provide financial assistance that shall exclusively be used for the continuation of payment of employee wages, salaries, and benefits to—(1) passenger air carriers, in an aggregate amount up to $25,000,000,000; . . . ." § 4112(a)(1).

The Act conditioned the financial assistance on certain required assurances by the air carriers, including the following: "To be eligible for financial assistance under this subtitle, an air carrier . . . shall enter into an agreement with the Secretary, or otherwise certify in such form and manner as the Secretary shall prescribe, that the air carrier . . . shall—(1) refrain from conducting involuntary furloughs or reducing pay rates and benefits until September 30, 2020; . . . ." § 4114(a)(1).

The Act set forth procedures for providing payroll support, including how the Secretary should determine the amounts awardable to air carriers, based on either

(1) prior salaries and benefits reported by the air carrier to the Department of Transportation during a specified period in 2019 or (2) for an air carrier that does not submit such reports, a certification of similar information (prior wages, salaries, benefits, and other compensation) based on financial statements or other appropriate data. § 4113(a)(1)-(2).

The Act further authorized the Secretary to determine the form and terms and conditions for the financial assistance (including requirements for audits and the clawback of financial assistance for failure to honor the assurances): "Financial assistance provided to an air carrier . . . under this subtitle shall be in such form, on such terms and conditions (including requirements for audits and the clawback of any financial assistance provided upon failure by a passenger air carrier . . . to honor the assurances specified in section 4114), as the Secretary determines appropriate." § 4113(b)(1)(A); *see also* § 4113(d) ("The Inspector General of the Department of the Treasury shall audit certifications made under subsection (a).").

The Act directed the Secretary to proceed rapidly: specifically, "[t]he Secretary shall publish streamlined and expedited procedures not later than 5 days after the date of enactment of this Act for air carriers . . . to submit requests for financial assistance under this subtitle," § 4113(b)(1)(B); and "[n]ot later than 10 days after the date of enactment of this Act, the Secretary shall make initial payments to air carriers" that submitted approved requests, § 4113(b)(2). Further, "[t]he Secretary shall determine an appropriate method" for making subsequent payments "from any funds remaining available" after the initial payments, § 4113(b)(3). And "[t]he Secretary shall have the authority to reduce, on a pro rata basis, the amounts due to air carriers . . . under the applicable paragraph of section 4112 in order to address any shortfall in assistance that would otherwise be provided under such section." § 4113(c).

## II.    The PSP Agreement

As authorized by the CARES Act, on April 20, 2020, United and Treasury entered into a Payroll Support Program Agreement ("PSP Agreement"). [1] ¶ 17.[1] The PSP Agreement is attached to the complaint. [1-1]. Thus, the court considers it on this motion to dismiss. (On the same day as the PSP Agreement, the parties also entered into a Promissory Note and a Warrant Agreement, *see* [18] at 5; [18-1] at 3. England does not claim breach of those agreements.)

There is a form Payroll Support Program Agreement on Treasury's website. *See* https://home.treasury.gov/system/files/136/Form-of-PSP-Agreement.pdf (visited Sept. 13, 2022). As United notes, [19] at 10, England does not dispute that the

---

[1] Bracketed numbers refer to docket entries and are followed by the page or paragraph number. Page numbers refer to the CM/ECF page number.

terms of United's PSP Agreement are identical to those of the form agreement (with the exception of the dollar amount of the initial support payment and the corporate officers signing the agreement).

Under United's PSP Agreement, United would receive an initial support payment of nearly $2.5 billion. [1] ¶ 17; [1-1] at 2. In return, United made the assurances required by the CARES Act, including to "use the Payroll Support exclusively for the continuation of Wages, Salaries, and Benefits" of its employees, [1-1] ¶ 4; not to conduct "an Involuntary Termination or Furlough of any Employee between the date of this Agreement and September 30, 2020," [1-1] ¶ 4(a); and (with specified exceptions) not to reduce, through September 30, 2020, the pay rate of any employee earning a salary, the pay rate of any employee earning wages, or employee benefits, [1-1] ¶ 4(b).

## III. United's Unpaid Time Off Program

On May 4, 2020, United announced that the CARES Act assistance only covered part of its payroll costs and that United would be implementing an unpaid time off program for certain employees (domestic management and administrative employees). [1] ¶ 24 (referring to "United's Unpaid Time Off Program"). Under this program, those employees were required to take 20 unpaid days off between May 16, 2020 and September 30, 2020. *Id.*

## IV. Procedural History

On May 13, 2020, England filed against United a one-count complaint for breach of contract under federal common law. England filed the complaint on behalf of a putative class of "[a]ll United non-union employees who are subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020." [1] ¶ 30. The complaint sought damages and injunctive relief.

The breach of contract claim asserts a third-party beneficiary theory. Specifically, as the basis of the breach of contract claim, the complaint alleges as follows: the PSP agreement is a binding contract between United and the Treasury Department; the PSP agreement by its terms is governed by federal law; United's employees are intended third party beneficiaries of the PSP Agreement under federal common law; and United's Unpaid Time Off Program violates the assurances made by United in Paragraph 4 of the PSP Agreement. [1] ¶¶ 41-43.

On February 3, 2022, the court ordered England to show cause whether this case was moot or should be dismissed for lack of Article III standing because it was unclear on the face of the complaint whether England was in fact subjected to the Unpaid Time Off Program and had suffered injury and damages. [24]. It was also unclear whether the request for injunctive relief was moot because the Unpaid Time

Off Program ended September 30, 2020. Both parties filed briefs in response to the court's order. [25]; [26]. England confirmed that he suffered a pay reduction as a result of the Unpaid Time Off Program during the period of May 16, 2020, through September 30, 2020, but conceded that his request for injunctive relief was moot. [27]. With respect to the claim for damages, England has met Article III's justiciability requirements.

The complaint invokes federal question jurisdiction under 28 U.S.C. § 1331 over the "federal common law breach of contract claim." [1] ¶ 8. The parties have not addressed whether this assertion is sound; but whether or not the parties have addressed the issue, the court has an independent obligation to ensure that it has subject matter jurisdiction before reaching the merits. Nonetheless, a similar issue existed in the litigation that led to *Astra*. *See County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237, 1243 n.5 (9th Cir. 2009), *rev'd sub nom. Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011). And there, the federal courts proceeded to the question whether plaintiffs could sue as third-party beneficiaries of government contracts. *See also Holbrook v. Pitt*, 643 F.2d 1261, 1270 n.16 (7th Cir. 1981). Thus, the court proceeds to the motion to dismiss.

## DISCUSSION

On a motion to dismiss under Rule 12(b)(6), the court "accept[s] as true all factual allegations in the complaint and draw[s] all permissible inferences in plaintiff['s] favor." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 365 (7th Cir. 2018). "To survive a motion to dismiss, a plaintiff must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* at 365–66 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 366 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Dismissal is appropriate where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

England does not assert that the CARES Act creates a private right of action to enforce the Act. Instead, the complaint alleges that United breached the PSP Agreement between United and Treasury, and that England can remedy that breach as an intended third-party beneficiary of the PSP Agreement. [1] ¶ 42.

United contends that *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), forecloses any attempt by England to enforce the PSP Agreement between United and Treasury as a third-party beneficiary.

*Astra* does foreclose this suit. *Astra* involved the "Section 340B" drug ceiling-price program. 563 U.S. at 113. Section 340B capped prices that drug

manufacturers could charge public hospitals and community health centers ("340B entities") for medications. The government (a unit of the Department of Health and Human Services) and private entities (the drug manufacturers) entered into form agreements by which the drug manufacturers opted into the statutory scheme (the Section 340B drug-ceiling price program). 340B entities contended that the drug manufacturers were overcharging the 340B entities for medications, in violation of the form agreements between HHS and the drug manufacturers. The 340B entities brought suit against the drug manufacturers as third-party beneficiaries of the form agreements. Section 340B provided for enforcement by HHS but did not create a private right of action.

*Astra* held that the third-party beneficiary suits were "incompatible with the statutory regime." *Id.* The Court began with the point that the 340B entities lacked a private right of action under the statute, and the principle that "recognition of any private right of action for violating a federal statute . . . must ultimately rest on congressional intent to provide a private remedy." *Id.* at 117 (citations, internal quotation marks, and alterations omitted). The 340B entities contended that they were intended third-party beneficiaries of the agreements, that the agreements "specifically name covered entities [340B entities] as the recipients of discounted drugs," and that the "very object" of the agreements was to benefit them by capping the price they would be charged. *Id.* at 117–18 (internal quotation marks and alterations omitted). The Court rejected this argument, reasoning in part that the form agreements

> simply incorporate statutory obligations and record the manufacturers' agreement to abide by them. The form agreements, composed by HHS, contain no negotiable terms . . . [T]he 340B Program agreements serve as the means by which drug manufacturers opt into the statutory scheme. A third-party suit to enforce an HHS-drug manufacturer agreement, therefore, is in essence a suit to enforce the statute itself. The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if 340B entities could overcome that obstacle by suing to enforce the contract's ceiling-price obligations instead. The statutory and contractual obligations, in short, are one and the same.

*Id.* at 118.

The Court further explained: "Telling in this regard, the County based its suit on allegations that the manufacturers charged more than the § 340B ceiling price, . . . not that they violated any independent substantive obligation arising only from the PPAs. Repeatedly, the County acknowledged that § 340B is the source of the contractual term allegedly breached." *Id.* at 118–19 (footnote omitted).

6

The Seventh Circuit in dicta has read *Astra* as holding that "a government contract that involves no negotiable terms but merely brings the other party to the contract under a statute (or, we can assume, a regulation) does not confer third-party beneficiary status on anyone." *Thomas v. UBS AG*, 706 F.3d 846, 852 (7th Cir. 2013); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 559 n.4 (7th Cir. 2012) ("Here, too, Congress did not create a private right of action to enforce the HAMP [Home Affordable Mortgage Program] guidelines, and since *Astra*, district courts have correctly applied the Court's decision to foreclose claims by homeowners seeking HAMP modifications as third-party beneficiaries of SPAs."); *id.* at 584 n.19 ("In *Astra*, the absence of a private right of action in the federal program was important because it showed that Congress did not intend plaintiffs to be third-party beneficiaries.").

Similarly, other courts have read *Astra* as generally prohibiting third-party beneficiary claims for government contracts that mirror a statutory obligation when the statute lacks a private right of action. *See Baginski v. JP Morgan Chase Bank N.A.*, No. 11 C 6999, 2012 WL 5989295, at *3 (N.D. Ill. Nov. 29, 2012) (rejecting third party beneficiary theory because "[i]n *Wigod*, our Court of Appeals clearly stated (albeit in dicta) that borrowers cannot sue for breach of an SPA because Congress did not create a private right of action under HAMP"); *Sioux Honey Ass'n v. Hartford Fire Ins. Co.*, 672 F.3d 1041, 1058 (Fed. Cir. 2012); *Moodie v. Kiawah Island Inn Co., LLC*, 124 F. Supp. 3d 711, 728 (D.S.C. 2015); *but see Olsen v. Nelnet, Inc.*, 392 F. Supp. 3d 1006, 1015 (D. Neb. 2019).

Here, as in *Astra*, the PSP Agreement mirrors the statute; the agreement "simply incorporates statutorily required terms and otherwise fails to demonstrate any intent to allow beneficiaries to enforce those terms." *Astra*, 563 U.S. at 119 n.4. For example, the CARES Act requires United to "refrain from conducting involuntary furloughs or reducing pay rates and benefits until September 30, 2020." CARES Act § 4114(a)(1). The PSP Agreement likewise requires United to refrain from conducting "an Involuntary Termination or Furlough of any Employee between the date of this Agreement and September 30, 2020." [1-1] ¶ 4(a). The "statutory and contractual obligations . . . are one and the same"; permitting a third-party suit to enforce the PSP Agreement would render "meaningless" the absence of a private right of action to enforce United's statutory obligations under the CARES Act. *Astra*, 563 U.S. at 118.

England observes that the CARES Act authorizes Treasury to provide funding to airlines exclusively for employees' wages, salaries, and benefits. But as discussed above, in *Astra*, the argument that the form agreements specifically named 340B entities "as the recipients of discounted drugs" and that the "very object" of the agreements was to benefit those entities (by capping the price they would be charged) did not overcome the circumstances that the agreements simply

incorporated statutory obligations and that there was no statutory private right of action. *Id.* The same is true here.

Further, the CARES Act provides a means for enforcement that, as in *Astra*, rests with the government. The Act authorized the Secretary to determine the form and terms and conditions for the financial assistance (including requirements for audits and clawback of financial assistance for failure to honor the assurances): "Financial assistance provided to an air carrier . . . under this subtitle shall be in such form, on such terms and conditions (including requirements for audits and the clawback of any financial assistance provided upon failure by a passenger air carrier . . . to honor the assurances specified in section 4114), as the Secretary determines appropriate." § 4113(b)(1)(A). This reinforces the incompatibility with the statute of third-party beneficiary suits. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001). As in *Astra*, permitting third-party beneficiary suits could interfere with Treasury's efforts to administer and monitor CARES Act funding for the airline industry "on a uniform, nationwide basis," *Astra*, 563 U.S. at 120, especially considering the rapid timeframe directed by Congress.

England contends that *Astra* is distinguishable because the CARES Act did not create a regulatory enforcement program. Indeed, *Astra* involved complex regulatory programs with which the third-party beneficiary suits at issue there could interfere—i.e., both the Medicaid Drug Rebate Program and the 340B Program. *See id.* at 120 & n.6 ("Far from assisting HHS, suits by 340B entities would undermine the agency's efforts to administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis. Recognizing the County's right to proceed in court could spawn a multitude of dispersed and uncoordinated lawsuits by 340B entities. With HHS unable to hold the control rein, the risk of conflicting adjudications would be substantial."). But the CARES Act does include a means of enforcement in § 4113(b)(1)(A), as noted above. And, as noted above (and as in *Astra*), permitting third-party beneficiary suits could interfere with Treasury's efforts to administer and monitor CARES Act funding for the airline industry "on a uniform, nationwide basis." *Id.* at 120. Courts have reached a similar conclusion in the context of another program administered by Treasury involving a response to emergency economic conditions. *Wigod*, 673 F.3d at 559 n.4 (discussing cases involving the Home Affordable Mortgage Program (HAMP) where "plaintiffs claimed to be third-party beneficiaries of their loan servicers' SPAs [Service Participation Agreements] with the United States," and noting that "[h]ere, too, Congress did not create a private right of action to enforce the HAMP guidelines, and since *Astra*, district courts have correctly applied the Court's decision to foreclose claims by homeowners seeking HAMP modifications as third-party beneficiaries of SPAs.").

England also argues that *Astra* is distinguishable because unlike the form agreements in *Astra*, the PSP Agreement here resulted from protracted negotiations between United and Treasury. *Cf. Astra*, 563 U.S. at 118 (agreements at issue "contain[ed] no negotiable terms" and simply "serve[d] as the means by which drug manufacturers opt into the statutory scheme"); *Thomas*, 706 F.3d at 852 ("a government contract that involves no negotiable terms but merely brings the other party to the contract under a statute (or, we can assume, a regulation) does not confer third-party beneficiary status on anyone"). Specifically, England contends that publicly reported negotiations, including over whether the funds would be provided as loans or in exchange for equity, took place over the weeks between March 27, 2020 (when the CARES Act was signed into law), April 3, 2020 (when United submitted an application for CARES Act funding), April 14, 2020 (when the airlines and Treasury announced an agreement in principle), and April 20, 2020 (when three documents were signed—the PSP Agreement, a Promissory Note, and a Warrant Agreement).[2]

On reply, United acknowledges that there were individualized negotiations between each airline and Treasury with respect to the amount and type of collateral an airline would pledge to receive the funding, but (1) contends that those negotiations involved agreements (the Promissory Note and Warrant Agreement) that are separate from the PSP Agreement and that England does not allege United has breached or seek to enforce as a third-party beneficiary; (2) notes that England does not dispute that the PSP Agreement, of which England does claim breach, is identical to the form agreement on Treasury's website; and (3) argues that even if the PSP Agreement includes additional terms beyond those required by the CARES Act, England's suit relies only on terms that *are* required by and mirror the CARES Act, contravening *Astra*.

To the extent that United's first argument relies on factual issues concerning the content of the negotiations, the court does not consider the argument at the motion to dismiss stage. However, it is true that England does not claim breach of the Promissory Note, Warrant Agreement, or any agreement other than the PSP Agreement. And United's second point—that England does not dispute that the PSP Agreement (of which England does claim breach) is identical to the form agreement on Treasury's website—is correct. United's third point is also correct: that England's suit relies only on terms of the PSP Agreement that are required by and mirror the CARES Act, and that the suit therefore cannot proceed under *Astra*'s reasoning. *Astra*, 563 U.S. at 118–19 ("Telling in this regard, the County based its suit on allegations that the manufacturers charged more than the § 340B ceiling price, . . . not that they violated any independent substantive obligation arising only from the PPAs. Repeatedly, the County acknowledged that § 340B is the source of

---

[2] The court may consider these additional facts set forth in plaintiff's opposition to the motion to dismiss, to the extent those facts are consistent with the pleadings. *Geinosky*, 675 F.3d at 745 n.1; *Phillips*, 714 F.3d at 1020.

the contractual term allegedly breached." (footnote omitted)).  In short, since the terms of the PSP Agreement that United allegedly breached simply mirror the CARES Act, a third-party beneficiary breach of contract claim is inconsistent with the absence of a private right of action in the CARES Act.

Nor does the PSP Agreement itself (apart from the statute) confer third-party beneficiary rights.  "A nonparty becomes legally entitled to a benefit promised in a contract . . . only if the contracting parties so intend."  *Astra*, 563 U.S. at 117.  This requirement is "emphasized" in the context of government contracts:  "The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity."  *Id.* at 118 (quoting 9 J. Murray, Corbin on Contracts § 45.6, p. 92 (rev. ed. 2007)).

The PSP Agreement does not display an intent for third parties to enforce the Agreement.  First, the Agreement states that "[t]his Agreement shall bind and inure to the benefit of the parties and their respective heirs, executors, administrators, successors, and assigns."  [1-1] ¶ 48.  Second, the "Remedies" section of the Agreement grants Treasury alone remedies for noncompliance with the Agreement.  [1-1] ¶¶ 22–28.  Specifically, paragraph 22 of the Agreement sets forth procedures if Treasury believes that noncompliance has occurred: notice, an explanation, and a proposed remedy; a seven-day opportunity for response; and a "final written determination" by Treasury as to noncompliance.  *Id.* ¶ 22.  "If Treasury makes a final determination under paragraph 22 that an instance of noncompliance has occurred, Treasury, may, *in its sole discretion*, withhold any Additional Payroll Support Payments; require repayment of the amount of any previously disbursed Payroll Support, with appropriate interest; require additional reporting or monitoring; initiate suspension or debarment proceedings as authorized under 2 CFR Part 180; terminate this Agreement; or take any such other action as Treasury, *in its sole discretion*, deems appropriate."  *Id.* ¶ 23 (emphases added).  Further, "Treasury may make a final determination regarding noncompliance without regard to paragraph 22 if Treasury determines, *in its sole discretion*, that such determination is necessary to protect a material interest of the Federal Government."  *Id.* ¶ 24 (emphasis added).  The Agreement does not confer third-party beneficiary rights.

## CONCLUSION

The motion to dismiss is granted.  The complaint is dismissed without prejudice.  England is granted leave to file an amended complaint.

Date: September 13, 2022                 /s/ Martha M. Pacold
                                          United States District Judge