**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KENNETH ENGLAND, and on behalf of himself and all others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No. 1:20-cv-02877** |
| **v.** | ) ) | **Judge Martha M. Pacold** |
| **UNITED AIRLINES, INC,** | ) ) | |
| **Defendant.** | ) ) | |

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

Plaintiff Kenneth England ("England"), on behalf of himself and all others similarly situated, through his attorneys, for his First Amended Class Action Complaint against United Airlines, Inc. ("United" or "Defendant"), states as follows:

**<u>NATURE OF PLAINTIFF'S CLAIMS</u>**

1.      In the face of economic uncertainty brought on by the global COVID-19 pandemic, Defendant provided its employees with a promise on March 27, 2020: **"*United will not conduct involuntary furloughs or pay cuts in the U.S. before September 30th.*"** Exhibit A (March 27, 2020 email from United's CEO Oscar Munoz and President Scott Kirby to employees) (emphasis in original).

2.      Weeks later, United doubled down on its promise, telling employees on April 15, 2020, "we're keeping our promise that there will be no involuntary furloughs or pay rate cuts for U.S. employees before September 30." Exhibit B (April 15, 2020 email to employees).

3.      United again memorialized this promise on April 20, 2020, signing an agreement that specifically provided that between the date of signing and September 30, 2020, United would

not "reduce without the Employee's consent, (A) the pay rate of any Employee earning a Salary, or (B) the pay rate of any Employee earning Wages." Exhibit C (April 20, 2020 PSP Agreement).

4.       United also issued a Promissory Note on April 20, 2020, evidencing indebtedness to the United States Department of Treasury ("Treasury"). This promissory note included a promise that the representations United made in the PSP Agreement were accurate. Exhibit D (April 20, 2020 Promissory Note).

5.       United did not keep any of these promises.

6.       After the deal with the Treasury was signed, United promptly broke the promises it had made to its employees. On May 4, 2020, United explained to its management and administration employees ("M&A employees") that "Effective between May 16 and September 30, domestic M&A employees will be required to take 20 unpaid days off." Exhibit E (May 4, 2020 email).

7.       United implemented its unpaid time off policy, in direct contravention to its promises, by deducting pay from employee paychecks throughout the period of May 16, 2020 to September 30, 2020. Plaintiff England saw a total of $9,962.82 in deductions from his pay because of United's broken promises.

8.       United's conduct breached both the PSP Agreement and the Promissory Note it signed on April 20, 2020. England and all other non-union employees subject to United's Unpaid Time Off Program can enforce those agreements as third-party beneficiaries to the agreements.

9.       United's conduct also constitutes promissory fraud, as United made a series of promises regarding involuntary furloughs and pay cuts, despite never intending to keep those promises, causing employees to rely on the false representations.

10.     Finally, United's conduct violates the Illinois Wage Payment and Collection Act, which provides recourse for employees like England and his coworkers when an employer makes a promise regarding compensation that it does not keep and protects employees against unauthorized deductions from their pay.

11.     Plaintiff Kenneth England, one of United's non-union employees, brings this class action lawsuit on behalf of three classes.

12.     First, he seeks to represent a class of all other non-union employees who were subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020, who were damaged by United's breach of the PSP Agreement and Promissory Note.

13.     Second, he seeks to represent a class of all other Illinois non-union employees who were subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020, who were damaged by United's promissory fraud.

14.     Third, he seeks to represent a class of all Illinois non-union employees who were paid a salary and were subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020, and who were damaged by United's violations of the Illinois Wage Payment and Collection Act.

## THE PARTIES

15.     Plaintiff Kenneth England works as a shift manager for United at the company's hub at Chicago O'Hare International Airport.

16.     Plaintiff England is a citizen of the State of Illinois and resides in and is domiciled in this judicial district.

17.     Defendant United Airlines, Inc. is a carrier by air incorporated in Delaware with its headquarters in Illinois.

3

## JURISDICTION AND VENUE

18.     This Court has original jurisdiction over Plaintiff's federal common law breach of contract claims under 29 U.S.C. § 1331.

19.     This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because they arise out of the same facts as his federal breach of contract claims.

20.     Venue is proper in the Northern District of Illinois pursuant to 29 U.S.C. §1391(a)(1) because Defendant resides in the Northern District of Illinois, Eastern Division.

## FACTS

**United's Pre-CARES Act Campaign**

21.     In March 2020, United engaged in a campaign to obtain financial support from the United States federal government to support its employees during the early stages of the COVID-19 pandemic.

22.     United explained in a March 16, 2020, letter to congressional leaders and Secretary of the Treasury Steven Mnuchin, "Financial support that you provide would allow United to continue paying our employees as we weather this crisis – protecting tens of thousands of people from imposing a temporary furlough."[1]

23.     United wrote congressional leaders again on March 21, 2020, along with management from other airlines, again stating that "[i]f worker payroll protection grants are enacted, equaling at least $29 billion, participating passenger and cargo air carriers will not furlough employees or conduct reductions in force through August 31, 2020."[2]

---

[1] https://www.reuters.com/article/health-coronavirus-usa-aviation/u-s-airlines-face-push-back-in-congress-on-50-billion-bailout-proposal-idUSL1N2BA1UP (last accessed Oct 4, 2022).
[2] https://www.forbes.com/sites/tedreed/2020/03/21/ten-airlines-say-no-layoffs-before-sept-1--if-congress-protects-payrolls/?sh=7551d65130e9 (last accessed Oct 4, 2022).

24.     This campaign to obtain government funds included direct appeals from United management to United employees, asking employees to call their representatives in Congress to provide the company with financial support.[3]

25.     For example, on March 20, 2020, Munoz and Kirby wrote to employees, "Please consider sending a letter or email to your representatives in Washington, D.C. urging them to take quick, bipartisan action to protect airline jobs." Exhibit F (March 20, 2020 email).

26.     On March 23, 2020, United emailed its employees, stating "Time is running out to make our voices heard! If you haven't already, please take a moment to send a letter (U.S. employees) to your representative in Washington, D.C. or sign a petition (International employees and retirees) to encourage government leaders to take quick, bipartisan action to protect airline jobs." Exhibit G (March 23, 2020 email).

27.     When the CARES Act ultimately passed, United thanked employees, stating, "Your participation in the last few days was critical. More than 30,000 of you sent more than 100,000 messages to your representatives in Congress and another 5,000 signed a petition for international employees and retirees. . . . The speed at which everyone stepped up and acted was remarkable and shows that when we come together, we can accomplish incredible things for our company. Thank you for what you did to help in getting this legislation passed."  Ex. A (March 27, 2020 email).

28.     United's promises that it would not impose involuntary furloughs or pay cuts were intended to induce employee support for its campaign to obtain government funds.

---

[3]  Slotnick, David, "Fear and anger are growing inside United Airlines, where workers are slamming the company over pay cuts after it took billions of dollars in government bailout money". 5/29/20 Bus. Insider 12:20:53.

**The CARES Act**

29.     On March 25, 2020, Congress enacted the Coronavirus Aid, Relief, and Economics Security Act, Pub. L. 116-136 ("CARES Act").  The law was passed in response to the COVID-19 pandemic and its economic consequences.

30.     The CARES Act authorizes the Secretary of Treasury to provide financial assistance to certain air carriers, provided those air carriers make certain assurances.

31.     This financial assistance is described in Subtitle B of the CARES Act, "Air Carrier Worker Support."

32.     Subtitle B, Part (a) of the CARES Act, titled "Financial Assistance for Employees Wages, Salaries, and Benefits," provides: "Notwithstanding any other provision of law, to preserve aviation jobs and compensate air carrier industry workers, the Secretary shall provide financial assistance that shall exclusively be used for the continuation of payment of employee wages, salaries, and benefits to (1) passenger air carriers, in an aggregate amount up to $25,000,000,000. . . " § 4112(a).

33.     The CARES Act specified certain assurances an air carrier must make to be eligible for financial assistance: "To be eligible for financial assistance under this subtitle, an air carrier or contractor shall enter into an agreement with the Secretary, or otherwise certify in such form and manner as the Secretary shall prescribe, that the air carrier or contractor shall (1) refrain from conducting involuntary furloughs or reducing pay rates and benefits until September 30, 2020." § 4114(a).

34.     Guidelines issued by the U.S. Treasury Department mandated that "to be eligible to receive payments," an applicant must agree to "use such payments exclusively for the continuation of employee wages, salaries, and benefits" and "refrain from conducting

involuntary layoffs or furloughs, or reducing pay rates and benefits, of employees of the applicant. . . "

### United's Post-CARES Act Promises

35.     Following the passage of the CARES Act, United promised, on multiple occasions, that the company would refrain from conducting involuntary layoffs or furloughs, or reducing pay rates and benefits.

36.     These promises were memorialized in the messages from United management to employees described above in Paragraphs 1 and 2.

### The Payroll Support Negotiations

37.     The same day the CARES Act was signed, March 27, 2020, the head of the airline trade organization, which includes United, announced, "We remain hopeful that the federal government will expeditiously release these funds with as few restrictions as possible to ensure airlines are able to utilize these provisions and meet our payroll."[4]

38.     Secretary of the Treasury Steve Mnuchin stated his opposing view, maintaining that the airline support "is not a bailout" and airlines may be required to provide the government with something in return for the transfer of funds.[5]

39.     Treasury hired investment bank PJT Partners and the law firm Cleary Gottlieb Steen & Hamilton LLP to represent the government in the employee assistance negotiations with the airlines.

40.     At a March 27, 2020, press conference, President Trump specifically addressed the government's negotiations with United, stating "[W]e will be able to handle United . . . Now,

---

[4] https://www.airlines.org/news/statement-from-a4a-president-and-ceo-nicholas-e-calio-after-the-signing-of-the-cares-act/ (last accessed Oct 4, 2022).
[5] https://www.reuters.com/article/us-health-coronavirus-usa-airlines/u-s-treasury-taps-wall-street-firms-for-aid-advice-sources-idUSKBN21K01P. (last accessed Oct. 4, 2022).

will we end up owning large chunks, depending on what these great geniuses decide, along with the executives of the different companies? You know, it's possible."[6]

41.     United submitted its application for CARES Act funding on April 3, 2020, after which United and other carriers had to "work with the Treasury Department to negotiate the terms of a possible deal."[7]  These negotiations extended beyond the deadlines the CARES Act imposed for funding, as NPR reported, "The major sticking point in negotiations involved whether airlines would be required to reimburse the government for the funds released pursuant to the CARES Act. Secretary Mnuchin proposed that some of the funds would be delivered as low-interest loans, while others would be transferred in exchange for a small share of equity in the company."[8]  The financial press reported, "Negotiations between airlines and the department over payroll grants have dragged on longer than expected after the Treasury Department requested more information and proposed additional conditions for the aid."[9]

42.     Ultimately, on April 14, 2020, eleven days after United submitted its application to participate in the payroll support program, the airlines and the Treasury announced an agreement in principle.  On April 15, 2020, United issued a press release announcing it was "completing the final agreements with the Treasury Department in the next few days."[10]

---

[6] Remarks at a White House Coronavirus Task Force Press Briefing, March 27, 2020, 2020 WLNR 11451000.
[7] https://www.washingtonpost.com/local/trafficandcommuting/us-airlines-begin-negotiations-on-bailout-aid-focused-on-front-line-workers/2020/04/06/42b8d910-7834-11ea-b6ff-597f170df8f8_story.html. (last accessed Oct. 4, 2022).
[8] https://www.npr.org/sections/coronavirus-live-updates/2020/04/14/834596139/airlines-reach-agreement-with-treasury-department-on-share-of-coronavirus-aid. (last accessed Oct. 4, 2022).
[9] https://www.cnbc.com/2020/04/13/coronavirus-aid-mnuchin-flexes-muscles-over-airline-grants-a-taste-of-what-other-companies-face.html (last accessed Oct. 4, 2022).
[10] https://finance.yahoo.com/news/airlines-ink-agreement-principle-billions-221745456.html (last accessed Oct. 4, 2022).

43.    The negotiations resulted in three documents signed on April 20, 2020, the PSP Agreement, a Promissory Note, and a Warranty Agreement.

**United's PSP Agreement**

44.    United issued a press release on April 15, 2020, announcing that it expected to receive approximately $5 billion in support under the CARES Act.  United spokesperson Frank Benenati said, "We thank Congress and the Administration for quickly passing legislation to protect the paychecks of tens of thousands of United Airlines employees and look forward to completing the final agreements with the Treasury Department in the next few days. . . . These funds will cover a portion of our pay and benefits costs through September 30, and we are thankful for the support provided to our employees and their families by the CARES Act.  This financial support is critical to our people, who are ensuring air service to communities throughout the country and supporting the shipment of much-needed medical supplies and travel of health care professionals around the globe."[11]

45.    On April 20, 2020, United and the Treasury Department entered into a Payroll Support Program Agreement ("PSP Agreement"), attached hereto as Exhibit C.  The PSP Agreement provides for an initial support payment to United of $2,479,249,048.

46.    In exchange for this payment, United agreed to the following: "The Recipient shall not conduct an Involuntary Termination or Furlough of any Employee between the date of this Agreement and September 30, 2020."  Exhibit C at Paragraph 4(a).

47.    United also agreed: "Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and September 30, 2020, reduce,

---

[11] https://www.bloomberg.com/press-releases/2020-04-15/united-airlines-expects-to-receive-5-0-billion-through-payroll-support-program-under-cares-act (last accessed Oct. 4, 2022).

without the Employee's consent, (A) the pay rate of any Employee earning a Salary, or (B) the pay rate of any Employee earning Wages." Exhibit C, at Paragraph 4(b)(i).

48.     United also agreed: "Except in the case of a Permitted Termination or Furlough, the Recipient shall not, between the date of this Agreement and September 30, 2020, reduce, without the Employee's consent, the Benefits of any Employee. . ."  Exhibit C, at Paragraph 4(b)(ii).

49.     The Parties defined "employee" in the PSP Agreement to include "salaried, hourly, full-time, part-time, temporary, and leased employees."

50.     The Parties defined an "Involuntary Termination and Furlough" as "the Recipient terminating the employment of one or more Employees or requiring one or more Employees to take a temporary suspension or unpaid leave for any reason, including a shut-down or slow-down of business."

51.     United employees are the intended beneficiaries of the PSP Agreement.  The primary purpose of the PSP Agreement is to provide funding for employees and to prevent furloughs and reductions in either pay or benefits.  All of the funds payable to United under the PSP Agreement must be used for "the continuation of payment of Wages, Salaries, and Benefits to the Employees of the Recipient."

**United's Promissory Note**

52.     On April 20, 2020, United and the Treasury Department signed a Promissory Note, attached hereto as Exhibit D.

53.     The Promissory Note evidences United's indebtedness to the Treasury, as compensation to the federal government for the provision of financial assistance under the PSP Agreement.

54.     The Promissory Note specifically provides that it was entered into because Treasury provided financial assistance for the continuation of payment of employee wages, salaries, and benefits.

55.     A default of the Promissory Note occurs when any representation made by United in the PSP Agreement shall prove to have been incorrect in any material respect when made.

56.     United employees are the intended beneficiaries of the Promissory Note, as the note was issued by United to secure funding for the continuation of payment of employee wages, salaries, and benefits.

**United's Unpaid Time Off Program**

57.     On May 4, 2020, United Executive Vice President of Human Resources and Labor Relations Kate Gebo emailed all management and administrative employees stating that the CARES Act assistance "only covers a part of our payroll costs." Exhibit E (May 4, 2020 email) As a result, Gebo announced changes to the work schedule for management and administrative employees. Gebo explained, "We will be implementing an unpaid time off program for domestic M&A employees to align with less flying, fewer customers, and less working time for frontline employees. Effective between May 16 and September 30, domestic M&A employees will be required to take 20 unpaid days off." *Id.*

58.     United began implementation of the Unpaid Time Off Program for the pay periods beginning May 16, 2020 and ending September 30, 2020. The Program involved withholding a specific amount from each employee's earnings each pay period. For example, on Plaintiff England's paycheck for that period, his "Regular Pay" of $5,395.84 was subject to a deduction, titled a "Temporary Pay Adjustment," of $1,106.98. See Exhibit H (Pay Statement for Pay Beginning 5/16/2020 and ending 5/31/2020).

59.     The same deduction was applied for all pay periods from May 16, 2020 through September 30, 2020, resulting in a total deduction from Plaintiff England's salary of $9,962.82

60.     The Unpaid Time Off Program violates the express terms of the promises United made both directly to employees, in the PSP Agreement, and in the Promissory Note.

61.     Furthermore, the Unpaid Time Off Program violates the intent of the contracting parties to enter into the PSP Agreement and Promissory Note to protect United employees, and Congress's intention to provide financial support for the employees of air carriers.

**Public Response to United's Broken Promises**

62.     One of the participants in the negotiations between the airlines and Treasury, the CEO of American Airlines Doug Parker, stated that United's policy violated the intent of both the law and the subsequent agreements.  Parker reportedly stated "Some airlines think it is OK to go and cut employees' hours…One [airline] is cutting full-time from 40 hours to 30, a 25% cut in pay.  I was there when we were working on CARES and that wasn't the intent or meaning of it. And that is not just for union employees – it is for non-union, too."[12]

63.     No other airline that received payroll support funding pursuant to the CARES Act imposed involuntary furloughs.

64.     Lawmakers also criticized United's conduct.

65.     Senator Josh Hawley from Missouri stated, "The taxpayers of this country have offered a generous bailout to your company and you should, in turn, honor this trust by keeping the promises you made to those you employ."[13]

---

[12] https://www.forbes.com/sites/tedreed/2020/05/05/american-airlines-ceo-says-united-cannot-legally-shift-workers-from-fulltime-to-parttime-sources-say/?sh=44275d6a6efd (last accessed Oct 4, 2022).
[13] https://www.hawley.senate.gov/senator-hawley-united-airlines-keep-your-promises-workers-or-give-cares-act-money-back (last accessed Oct. 4, 2022).

66. Congresswoman Shelia Lee Jackson from Texas stated, "[T]he CARES Act and the Paycheck Protection Program was intended to make employees whole during this devastating time due to COVID-19. I realize that the airline industry along with most businesses have been severely impacted, but it was not the intent of Congress for this program to be used as an economic bail-out, but to support the hard-working men and women who are the faces of United Airlines."

67. Congressman Kevin Brady from Texas stated, "The CARES Act is focused on protecting workers and prevent rewarding executives. In doing so, the CARES Act prevents furloughs through September 30th, 2020."

68. Senator Bob Casey from Pennsylvania stated, "Congress recognized the extent to which the current COVID-19 pandemic has negatively affected the airline industry and provided assistance in the CARES Act specifically to air carriers to protect the jobs and livelihoods of workers in the airline industry."

69. Congressman Albio Sires from New Jersey stated, "The financial assistance provided to airlines by [the CARES Act] – $5 billion of which was accepted by United – is intended to help keep employees on payroll and ensure that they receive the benefits they earned in years of service to you."

## CLASS ACTION ALLEGATIONS

70. Pursuant to Rule 23(b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and the following classes of similarly situated individuals subject to United's Unpaid Time Off Program:

**Nationwide Class:** All United non-union employees who were subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020 (the "Nationwide Class").

**Promissory Fraud Class:** All United non-union employees who worked in Illinois and were subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020 (the "Promissory Fraud class").

**IWPCA Class:** All United non-union employees who worked in Illinois, who were paid a salary, and were subject to United's Unpaid Time Off Program between May 16, 2020 and September 30, 2020 (the "IWPCA class").

71.     The proposed classes are so numerous that joinder of all members is impracticable.

72.     The claims of the named Plaintiff are typical to the members of the proposed classes.

73.     The named Plaintiff and members of the Nationwide Class are all the intended beneficiaries of the PSP Agreement and Promissory Note and were all subject to United's policy of mandating unpaid leave in direct violation of the terms of those Agreements.  As a result, each and every class member suffered the same harm.

74.     The named Plaintiff and members of the Promissory Fraud Class were all damaged by the alleged violations of Illinois law. As a result, each and every class member suffered the same harm.

75.     The named Plaintiff and members of the IWPCA Class were all damaged by the alleged violations of the IWPCA. As a result, each and every class member suffered the same harm.

76.     Questions of law and fact are common to the class and predominate over any

individual questions.

77.   Questions of law and fact common to the Nationwide Class include, but are not limited to, whether the members of the proposed Nationwide Class were the intended beneficiaries of the PSP Agreement and Promissory Note and whether United violated the PSP Agreement and Promissory Note by requiring employees to take unpaid time off prior to September 30, 2020.

78.   Questions of law and fact common to the Promissory Fraud Class include, but are not limited to, whether United made false representations to employees, whether United had knowledge of those statement's untruthfulness when the statements were made, whether United intended to induce reliance by employees on the false representations, and whether employees relied on the false representations to their detriment.

79.   Questions of law and fact common to the IWPCA Class include, but are not limited to, whether United agreed to pay employees a salary, whether United failed to pay employees the agreed upon salary, whether United took deductions from employees' wages, and whether United was prohibited from taking deductions from employees' wages.

80.   Plaintiff will fully and adequately protect the interests of the classes. Plaintiff seeks the same recovery as the classes, predicated upon the same violations of the PSP Agreement, the Promissory Note, and Illinois law.

81.   Plaintiff has retained counsel who are qualified and experienced in the prosecution of employee class actions.

82.   Neither Plaintiff nor his counsel have interests that are contrary to, or conflicting with, the interests of the classes.

83.     Pursuant to Fed. R. Civ. P. 23(b)(1)(A), the prosecution of this matter in hundreds of identical, individual lawsuits would create a risk of inconsistent results and would establish incompatible standards of conduct for United.

84.     Pursuant to Fed. R. Civ. P. 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The damages suffered by the individual class members are small compared to the expense and burden of individual prosecutions of this litigation.  Prosecuting hundreds of identical, individual lawsuits would not promote judicial efficiency or equity.  Class certification will eliminate the need for duplicate litigation.

## COUNT I

### Breach of Contract Under Federal Common Law – PSP Agreement
### (On Behalf of Plaintiff and the Nationwide Class)

85.     Plaintiff hereby realleges and incorporates the above paragraphs of this Complaint, as if fully set forth herein.

86.     The PSP Agreement is a binding contract between United and the Department of the Treasury, which by its terms is governed by federal law.

87.     United's employees are intended third-party beneficiaries of the PSP Agreement under federal common law.

88.     United's Unpaid Time Off Program violates the assurances made by United in Paragraph 4 of the PSP Agreement.

## COUNT II

**Breach of Contract Under Federal Common Law – Promissory Note
(On Behalf of Plaintiff and the Nationwide Class)**

89.     Plaintiff hereby realleges and incorporates the above paragraphs of this
Complaint, as if fully set forth herein.

90.     The Promissory Note is a binding contract between United and the Department of
the Treasury, which by its terms is governed by federal law.

91.     United's employees are intended third-party beneficiaries of the Promissory Note
under federal common law.

92.     United's Unpaid Time Off Program violates the assurances made by United in
Section 5.1(c) of the Promissory Note.

## COUNT III

**Promissory Fraud under Illinois Law
(On Behalf of Plaintiff and the Promissory Fraud Class)**

93.     Plaintiff hereby realleges and incorporates the above paragraphs of this
Complaint, as if fully set forth herein.

94.     On March 16, 2020, March 21, 2020, March 27, 2020, April 15, 2020, and April
20, 2020, Defendant represented that it would not impose involuntary furloughs or pay rate cuts
on its employees.

95.     At the time it made the representations, Defendant knew that it would impose
involuntary furloughs and pay rate cuts, which can be inferred by the quick decision to impose
such policies after securing federal funding.

96.     Defendant's false representations were made for the purpose of inducing reliance
by employees.

97.     Plaintiff and the Promissory Fraud Class relied on the representations to their detriment.

## COUNT IV

**Illinois Wage Payment and Collection Act – Section 4**
**(On Behalf of Plaintiff and the IWPCA Class)**

98.     Plaintiff hereby realleges and incorporates the above paragraphs of this Complaint, as if fully set forth herein.

99.     Plaintiff and the IWPCA Class are employees as defined under the IWPCA. 820 ILCS 115/2.

100.     United is an employer under the IWPCA. 820 ILCS 115/2.

101.     The IWPCA, 820 ILCS 115/2, defines "wages" to be "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation."

102.     The IWPCA, 820 ILCS 115/4, requires that "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned."

103.     United agreed to pay Plaintiff a specific annual salary, paid semi-monthly, in exchange for the work he performed for United.  There existed mutual assent between United and Plaintiff that United would pay a minimum guaranteed amount – a salary – for variable hours worked each week.

104.     United agreed to pay other similarly situated employees specific salaries for the work they performed for United. There existed mutual assent between United and the similarly situated employees that United would pay a minimum guaranteed amount – a salary – for variable hours worked each week.

105.    United agreed to not conduct involuntary furloughs or pay cuts in the US before September 30th.

106.    Between May 16, 2020 and September 30, 2020, Plaintiff and members of the IWPCA Class performed work for United.

107.    Between May 16, 2020 and September 20, 2020, United did not compensate Plaintiff and members of the IWPCA class the salary United agreed to pay them for the work they performed.

108.    Between May 16, 2020 and September 20, 2020, United paid Plaintiff and members of the IWPCA class less than the salary United agreed to pay them for the work they performed.

109.    United's failure to pay Plaintiff and the members of the IWPCA class for all the wages they earned under the agreement of the parties violated the IWPCA.

## COUNT V

### Illinois Wage Payment and Collection Act – Section 9
### (On Behalf of Plaintiff and the IWPCA Class)

110.    Plaintiff hereby realleges and incorporates the above paragraphs of this Complaint, as if fully set forth herein.

111.    The IWPCA, 820 ILCS 115/9 prohibits "deductions by employers from wages" unless the deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made; (5) made by certain government entities.

112.    Between May 16, 2020 and September 20, 2020, United made deductions from Plaintiff's and the IWPCA Class's salaries that were already earned.  Specifically, United withheld an amount, referred to as a "Temporary Pay Adjustment," from each employee's "Regular Pay."

113.   The deductions made from Plaintiff's and the IWPCA Class's wages were not required by law, were not to the benefit of Plaintiff, were not in response to a valid wage assignment or wage deduction order, were not made with the express written consent by the employee, and were not made by a government entity.

114.   United's deductions from Plaintiff's and the IWPCA Class's wages violated the IWPCA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all other members of the proposed classes, respectfully requests this Court grant the following relief:

A.   That an order be entered certifying the proposed classes and appointing Plaintiff and his counsel to represent the proposed classes;

B.   For all recoverable compensatory and other damages sustained by the Plaintiff and the class, and all other relief allowed under applicable law;

C.   Statutory penalties pursuant to Section 820 ILCS 115/14 of the IWPCA;

D.   For costs;

E.   For both pre-judgment and post-judgment interest on any amounts awarded;

F.   For payment of attorney's fees and expert fees as may be allowable under applicable law; and

G.   For such other and further relief, including declaratory relief, as the Court may deem proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated:  October 11, 2022

s/Douglas M. Werman
One of Plaintiff's Attorneys

Douglas M. Werman - dwerman@flsalaw.com
Maureen A. Salas - msalas@flsalaw.com
Sarah J. Arendt - sarendt@flsalaw.com
Michael M. Tresnowski – mtresnowski@flsalaw.com
**WERMAN SALAS P.C.**
77 W. Washington St, Ste 1402
Chicago, IL 60602
T: (312) 419-1008
F: 312) 419-1025